```
        ┌─────────────────────────────────┐
        │ ✓ FILED _____ ____ LODGED       │
        │ ___ RECEIVED ____ COPY           │
        │                                  │
        │        APR 2 3 2009              │
        │                                  │
        │   CLERK U S DISTRICT COURT       │
        │      DISTRICT OF ARIZONA         │
        │ _____ B  DEPUTY    │
        └─────────────────────────────────┘
```

1   David M. Glaser (MN Bar No: 228874)
    Lousene M. Hoppe (MN Bar No. 387171)
2   *Pro hac vice application pending*
    Fredrikson & Byron, P.A.
3   200 South Sixth Street, Suite 4000
    Minneapolis, MN 55402-1425
4   Telephone:   (612) 492-7000
    Facsimile:   (612) 492-7000
5   E-Mail:      dglaser@fredlaw.com
                 lhoppe@fredlaw.com
6
7   Attorneys for Plaintiff

8              **UNITED STATES DISTRICT COURT**

9              **FOR THE DISTRICT OF ARIZONA**

10

11  Mayo Clinic Arizona d/b/a
    Mayo Clinic Hospital
12  Phoenix, Arizona,                    Case No. CV 09-863-PHx-SRB

13                    Plaintiff,         **COMPLAINT**

    v.
14
    Charles E. Johnson, in his official
15  capacity as Acting Secretary of
    Health and Human Services,
16
                      Defendant.
17

18       Plaintiff, Mayo Clinic Hospital of Phoenix, Arizona ("Mayo Clinic"), for its

19  Complaint against Defendant Charles E. Johnson (the "Secretary"), hereby states and
20
21  alleges as follows:

22                        **INTRODUCTION**

23       1.   By and through this action, Plaintiff seeks judicial review of the decision by
24
25  the Administrator of the Centers for Medicare & Medicaid Services ("CMS") dated

26  February 24, 2009.  The Administrator reversed a previous decision by the Department of

27  Health and Human Services Provider Reimbursement Review Board ("PRRB") dated

28  December 22, 2008.  The issue before the PRRB was whether CMS's fiscal intermediary

                                    1

("Intermediary") used the proper cost-to-charge ratios when calculating payments due to Mayo Clinic for "outlier" cases during fiscal years 2000-2002, as authorized by 42 U.S.C. § 1395ww(d). "Outliers" are cases in which the patient's medical condition is unusually severe, resulting in higher costs when compared with the reimbursement a hospital would normally receive under Medicare's inpatient prospective payment system ("IPPS").

2.      Normally, payments for outlier cases are calculated using hospital-specific cost data. Each year, a hospital files a cost report with CMS prior to receiving its Medicare reimbursement. The filed cost report is eventually settled by the Intermediary, which then notifies the hospital of the reimbursement due. Data from the settled cost reports are used to calculate the cost-to-charge ratio—an important factor in determining outlier payments.

3.      Mayo Clinic was a new hospital in 1998. Although it filed its first cost report with the Intermediary as early as May 31, 2000, the Intermediary did not issue a settled cost report until 2005. Despite the fact that it had access to Mayo Clinic's filed cost reports, the Intermediary used data based on statewide averages to calculate the outlier payments due to Mayo Clinic for patient discharges that occurred in fiscal years 2000 - 2002.

4.      Regulations in effect during the relevant time period permit Intermediaries to use statewide averages cost-to-charge ratios only when data derived from the hospital's cost report falls outside reasonable parameters, as established by CMS. CMS policy also allowed the use of state averages for new hospitals that had not yet filed their first Medicare cost report. Both the regulations and policy are silent regarding how to

calculate outlier payments for new hospitals that have filed a cost report but have not yet received a settled cost report.

5.      Guidance from CMS indicates that the Intermediary should use the most current and accurate available data to calculate outlier payments.  When no settled cost report is available, the most accurate data is the hospital-specific data provided in the provider's most recently filed cost report.

6.      Mayo Clinic appealed the Intermediary's decision to use statewide average data to calculate its outlier payments during fiscal years 2000 - 2002.  The PRRB held that the Intermediary did not use the proper cost-to-charge ratios to calculate Mayo Clinic's outlier payments, because the cost-to-charge ratios should have been based on data found in the hospital's most recently filed cost reports.   The PRRB thus reversed the Intermediary's decision to base its calculations on statewide average cost-to-charge ratios and remanded the matter to the Intermediary to recalculate the improper payments.  The Administrator later reversed the PRRB's decision, holding that the Intermediary properly applied relevant agency regulations by calculating the cost-to-charge ratios using the statewide average.

7.      Plaintiff seeks an order reversing the Administrator's decision and remanding this matter to the Defendant, with instructions to recalculate Mayo Clinic's cost-to-charge ratios using data from the hospital's submitted cost reports and to make additional payments to Mayo Clinic for the services it provided Medicare patients during the years at issue.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THE PARTIES**

8.      Defendant Charles E. Johnson (the "Secretary") is the Acting Secretary of the Department of Health and Human Services of the United States, whose responsibilities include implementing Title XVIII of the Social Security Act (the "SSA" or "Act"), as amended, 42 U.S.C. § 1395, *et seq.* (the "Medicare program"), through CMS. He is named as a defendant herein in his official capacity.

9.      Plaintiff Mayo Clinic Hospital of Phoenix, Arizona is an independent not-for-profit corporation. Its principal place of operation is in Phoenix (Scottsdale), Arizona. Mayo Clinic is a provider of medical services to Medicare recipients and submits bills for its services to the Medicare program.

**JURISDICTION AND VENUE**

10.      This Court has jurisdiction under 28 U.S.C. § 1331 (federal question), and Section 1878(f)(1) of the Social Security Act, 42 U.S.C. § 1395oo(f)(1) (establishing the right to judicial review of any PRRB decision, and any decision by the Secretary of Health and Human Services reversing a PRRB decision).

11.      Venue in this District is proper pursuant to 42 C.F.R. § 405.1877(f).

**APPLICABLE LAW**

12.      CMS is charged with administering the Medicare program for the Department of Health and Human Services ("DHHS"). CMS's payment and audit functions for the Medicare program are contracted out to insurance companies known as fiscal intermediaries. Intermediaries determine payment amounts due to providers under

4

Medicare law, using regulations and interpretive guidelines established by CMS. *See* 42 U.S.C. § 1395h (2006); 42 C.F.R. §§413.20-.24 (2008).

13.    Congress has determined that the Medicare program should provide "reasonable cost" reimbursement, which is governed by Title 43 of the United States Code, Section 1395x(v)(1)(A). Congress has determined that the reasonable cost of any service shall be the actual cost incurred, excluding any part of such costs found to be unnecessary in the efficient delivery of health services. CMS's implementing regulation provides that reasonable cost includes all "necessary and proper" costs incurred in furnishing healthcare services. 42 C.F.R. § 413.9.

14.    At the close of its fiscal year, a Medicare program provider is required to submit a cost report to the Intermediary that details the costs it incurred during the fiscal year and the portion of those costs to be allocated to the Medicare program. *See* 42 C.F.R. § 413.20. The Intermediary reviews the filed cost report, determines the total amount of reimbursement due to the provider, and issues to the provider a Notice of Program Reimbursement ("NPR"). 42 C.F.R. § 405.1803. At this point, the cost report is "settled."

15.    Effective with cost reporting periods beginning on or after October 1, 1983, Congress instituted the inpatient prospective payment system ("IPPS") to calculate the Medicare program's reimbursement for inpatient hospital operating costs. SSA § 1886(d), codified at 42 U.S.C. § 1395ww(d). Such costs are based on prospectively set rates per patient discharge. *See* 42 C.F.R. 412.60.

16.     The IPPS statute provides that a hospital may receive additional payments when its charges "adjusted to cost" exceed certain dollar values.     42 U.S.C. § 1395ww(d)(5)(A).   To implement this provision, CMS promulgated regulations at 42 C.F.R. § 412.80-.89.  Under these regulations, when treatment of a certain patient requires an unusually high use of hospital resources, the hospital may qualify for additional reimbursement.  Such cases are commonly referred to as "outliers."  42 C.F.R. 412.84. Hospitals receive outlier payments when a particular case carries costs that exceed a fixed-loss ratio established by CMS.  42 C.F.R. 412.80(a)(2)-(3).

17.     The regulations also include instructions for calculating and applying the cost-to-charge ratio in outlier determinations.   To calculate reimbursement in outlier cases, the Intermediary determines the ratio of a hospital's operating and capital costs to its charges and then applies that ratio to the covered portion of a particular costly case to determine if it exceeds the fixed-loss threshold.  If so, the provider is entitled to receive additional reimbursement.  42 C.F.R. 412.80. The regulations in effect prior to 2003 did not address how to calculate reimbursement for new hospitals.  For existing hospitals, the regulations require that the cost-to-charge ratio for each hospital be computed annually by the Intermediary based on the hospital's "latest available settled cost report" and data regarding hospital charges during that same period.  42 C.F.R. 412.84(h) (2002).  When a hospital's operating or capital cost-to-charge ratio falls outside "reasonable parameters," the regulation allows the Intermediary to use statewide average cost-to-charge ratios, rather than the ratios derived from a hospital's cost report. *Id.*

18.     Although the regulations were silent regarding new hospitals during the time at issue here, CMS had a long-standing policy regarding hospitals that had not yet filed their first Medicare cost report with a fiscal intermediary.  In that situation, CMS used statewide cost-to-charge ratios to compute a reasonable cost-to-charge ratio for outlier cases. *See* 53 Fed. Reg. 38,746, 38,503 (Sept. 30, 1988).

19.     CMS recognizes that hospital-specific data is more accurate and, therefore, preferable to aggregate data: "[T]he use of hospital-specific cost-to-charge ratios should greatly enhance the accuracy with which exceptionally costly outlier cases are identified and outlier payments are computed, given the wide variation among hospitals in their cost-to-charge ratios."  53 Fed. Reg. 34,476, 34,507 (Sept. 30, 1988).  With respect to calculating the cost-to-charge ratio, CMS has explained: "We believe that the hospital-specific cost-to-charge ratios should be developed using the most current and accurate data available." *Id.*

20.     CMS's own regulations and policy indicate that statewide averages may only be used when hospital-specific data falls outside reasonable parameters or when a hospital has not yet filed its cost report.  CMS's guidance indicates that Intermediaries should rely on data available in a hospital's filed cost report when a settled cost report is not available, because that is most accurate data available.

## **FACTUAL BACKGROUND**

21.     Mayo Clinic is a general acute care teaching hospital that entered the Medicare program on November 18, 1998.

22.    BlueCross and BlueShield Association is the Intermediary that receives and processes requests for reimbursement from the Medicare program submitted by Mayo Clinic.

23.    Mayo Clinic's submitted its first cost report—for fiscal year end ("FYE") December 31, 1999—on May 31, 2000.  Mayo Clinic subsequently submitted an amended cost report for FYE December 31, 1999, on February 21, 2001.  Mayo Clinic submitted its FYE December 31, 2000 cost report on July 17, 2002, and its FYE December 31, 2001 cost report on November 16, 2002.

24.    Mayo Clinic did not receive an NPR for any of its first three years of operation until September 26, 2005.

25.    When calculating Mayo Clinic's outlier payments for discharges during fiscal years 2000, 2001, and 2002, the Intermediary elected to use statewide cost-to-charge ratios rather than ratios based on the more accurate information submitted in its cost reports.

26.    The Intermediary continued to use statewide averages until January 22, 2003.  On that date, apparently recognizing that there was more accurate data available, the Intermediary began using the cost-to-charge ratio from Mayo Clinic's most recently filed, but not settled, cost report.

27.    Mayo Clinic has a practice of keeping its charges relatively close to its costs.  As a result, Mayo Clinic's cost-to-charge ratio is significantly higher than the statewide average for each of the years in question.  Thus, by using the statewide average,

the Intermediary's calculated reimbursement for outlier cases was far below Mayo Clinic's actual costs.

28.    Plaintiff estimates that the Intermediary's decision to use the statewide data to calculate its outlier payments resulted in the following underpayments:

FY 2000:        $ 1,506,850
FY 2001:        $ 2,743,400
FY 2002:        $ 1,925,935
                $ 6,176,185

## ADMINISTRATIVE APPEAL

29.    Mayo Clinic appealed to the PRRB from the Intermediary's determination pursuant to 42 C.F.R. §§ 405.1835-405.1841.  The administrative appeal proceeded under the caption, *Mayo Clinic Hospital Phoienix, Arizona v. BlueCross BlueShield Association/Noridian Administrative Services*, Case Nos. 06-1300; 06-1301; 06-1307.

30.    On December 22, 2008, the PRRB entered its decision, reversing the Intermediary's determination and remanding the matter to the Intermediary to recalculate Mayo Clinic's outlier payments based on the hospital's most recently filed cost reports.  A true and correct copy of the PRRB's decision is attached hereto as Exhibit A.

31.    On January 13, 2009, the Office of the Attorney Advisor issued a notice stating that the Administrator had decided to review the PRRB's decision and that an Administrator's decision would be rendered within sixty days, pursuant to 42 C.F.R. § 405.1875.

32.    The Office of the Administrator issued a decision dated February 24, 2009. The Administrator reversed the PRRB's decision and found that the Intermediary properly applied the applicable regulations by calculating the cost-to-charge ratios using the

9

statewide average.  A copy of the Administrator's Decision is attached hereto as Exhibit B.

33.    Mayo Clinic's request for judicial review is timely pursuant to 42 U.S.C. § 1395oo(f)(1), and it has otherwise satisfied the prerequisites for judicial review set forth under that statute.

<div align="center">

**COUNT I**

</div>

34.    Mayo Clinic restates and incorporates by reference the allegations set forth in the preceding paragraphs.

WHEREFORE, Mayo Clinic respectfully requests the following relief:

1.    That the Court reverse the Administrator's decision and remand this matter to the Defendant with instructions to recalculate the cost-to-charge ratios for fiscal years 2000, 2001, and 2002 based on the data provided in Plaintiff's submitted cost reports and to make additional payments to Plaintiff as appropriate;

2.    That Plaintiff be awarded prejudgment interest, pursuant to 42 U.S.C. § 1395oo(f)(2) and 42 C.F.R. § 413.64(j), the common law, and all other applicable laws, statutes and regulations;

3.    That Plaintiff be awarded its costs and disbursements herein; and

4.    For such other and further relief as the Court deems just and equitable.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: April 22, 2009

Respectfully Submitted,

David M. Glaser (# 228874)
Lousene M. Hoppe (#285419)
FREDRIKSON & BYRON, P.A.
Attorneys for Plaintiff

#4545790/1



**DEPARTMENT OF HEALTH AND HUMAN SERVICES**
**PROVIDER REIMBURSEMENT REVIEW BOARD**
2520 Lord Baltimore Drive, Suite L
Baltimore MD 21244-2670

Phone: 410-786-2671
FAX: 410-786-5298

Internet: www.cms.hhs.gov/PRRBReview

Refer to Case Nos.: 06-1300; 06-1301; 06-1307
Decision No.: 2009-D5

DEC 2 2 2008

**CERTIFIED MAIL**

Mr. Ronald W. Grousky
Medicare Coordinator
Mayo Foundation
Ozmun West 3
200 First Street SW
Rochester, MN  55905

RE:  Mayo Clinic Hospital
     Provider No.:  03-0103
     FYEs - 12/31/2000; 12/31/2001; 12/31/2002

Dear Mr. Grousky:

A copy of the Provider Reimbursement Review Board's decision on the above-referenced appeal is enclosed.  Please see enclosure for review and appeal information.

If you have any questions, please call (410) 786-2671.

Sincerely,

Paul J. Crofton, Director
Division of Hearings and Decisions

5 Enclosures
   Final Decision Review and Appeal Information
   Decision
   42 USC 1395oo(f)
   42 CFR 405.1875 and 405.1877

**EXHIBIT A**

# PROVIDER REIMBURSEMENT REVIEW BOARD DECISION

2009-D5

**PROVIDER -**
Mayo Clinic Hospital
Phoenix, Arizona

Provider No.:  03-0103

**vs.**

**INTERMEDIARY –**
BlueCross BlueShield Association/
Noridian Administrative Services

**DATE OF HEARING -**
January 25, 2008

Cost Reporting Periods Ended -
December 31, 2000; December 31, 2001
and December 31, 2002

**CASE NOs.:** 06-1300; 06-1301; 06-1307

## INDEX

| | Page No. |
|---|---|
| Issue............................................................................................................................ | 2 |
| Medicare Statutory and Regulatory Background.................................................. | 2 |
| Statement of the Case and Procedural History..................................................... | 4 |
| Parties' Contentions............................................................................................. | 5 |
| Findings of Fact, Conclusions of Law and Discussion........................................ | 6 |
| Decision and Order.............................................................................................. | 8 |

ISSUE:

Whether the Intermediary used proper cost to charge ratios in calculating the Provider's
outlier payments.

MEDICARE STATUTORY AND REGULATORY BACKGROUND:

This is a dispute over the amount of Medicare reimbursement due a provider of medical
services.

The Medicare program was established to provide health insurance to the aged and
disabled. 42 U.S.C. §§1395-1395cc. The Centers for Medicare and Medicaid Services
(CMS), formerly the Health Care Financing Administration (HCFA), is the operating
component of the Department of Health and Human Services (DHHS) charged with
administering the Medicare program. CMS' payment and audit functions under the
Medicare program are contracted out to insurance companies known as fiscal
intermediaries. Fiscal intermediaries determine payment amounts due the providers
under Medicare law and under interpretive guidelines published by CMS. See, 42 U.S.C.
§1395h, 42 C.F.R. §§413.20 and 413.24.

At the close of its fiscal year, a provider must submit a cost report to the fiscal
intermediary showing the costs it incurred during the fiscal year and the portion of those
costs to be allocated to Medicare. 42 C.F.R. §413.20. The fiscal intermediary reviews
the cost report, determines the total amount of Medicare reimbursement due the provider
and issues the provider a Notice of Program Reimbursement (NPR). 42 C.F.R.
§405.1803. A provider dissatisfied with the intermediary's final determination of total
reimbursement may file an appeal with the Provider Reimbursement Review Board
(Board) within 180 days of the issuance of the NPR. 42 U.S.C. §1395oo(a); 42 C.F.R.
§405.1835.

Medicare reasonable cost reimbursement is governed by 42 U.S.C. §1395x(v)(1)(A). In
part, the statute provides that the "reasonable cost" of any service shall be the actual cost
incurred but excluding any part of such costs found to be unnecessary in the efficient
delivery of needed health services. The implementing regulation at 42 C.F.R. §413.9
provides that reasonable cost includes all "necessary and proper" costs incurred in
furnishing healthcare services.

Effective with cost reporting periods beginning on or after October 1, 1983, short-term
acute care hospitals became subject to Medicare's Prospective Payment System (PPS).
Under this system Medicare's payment for inpatient Part A operating costs is made on
prospectively set rates per discharge. In general, Medicare discharges are classified into
diagnostic related groups (DRG) and a specific payment weight is assigned to each DRG
based on resource use or intensity.

Payments made to hospitals under PPS are adjusted (increased) when certain conditions
exist. For example, DRG payments are increased when a hospital provides care to a

disproportionate number of low income patients, or when a hospital incurs the indirect costs of graduate medical education programs.  Relevant to the instant cases is the increase in PPS payments for "outliers," i.e. discharges for which resource use is unusually high.  To qualify for outlier payments a case must have costs above a fixed-loss threshold established by CMS.  In general, the ratios of a hospital's costs to its charges (i.e., the ratio of operating costs to charges in addition to the ratio of capital costs and charges) are applied to the "covered charges" of a particular costly case to determine if it exceeds the fixed-loss threshold.

42 C.F.R. §412.84(h) provides the rules for applying cost-to-charge ratios in outlier determinations.  Prior to 2003, this regulation stated:

> The operating cost-to-charge ratio and, effective with cost
> reporting periods beginning on or after October 1, 1991, the
> capital cost-to-charge ratio used to adjust covered charges
> are computed annually by the intermediary for each
> hospital based on the latest available settled cost report for
> that hospital and charge data for the same time period as
> that covered by the cost report.  Statewide cost-to-charge
> ratios are used in those instances in which a hospital's
> operating or capital cost-to-charge ratios fall outside
> reasonable parameters.  HCFA sets forth these parameters
> and the statewide cost-to-charge ratios in each year's
> annual notice of prospective payment rates published under
> §412.8(b). (Emphasis added).

In 2003, 42 C.F.R. §412.84(h) was modified, in part, addressing cost to charge ratios applicable to outlier determinations for new hospitals.  In pertinent part, the regulation states:

> (h) For discharges occurring before October 1, 2003, the
> operating and capital cost-to-charge ratios used to adjust
> covered charges are computed annually by the intermediary
> for each hospital based on the latest available settled cost
> report for that hospital and charge data for the same time
> period as that covered by the cost report. For discharges
> occurring before August 8, 2003, statewide cost-to-charge
> ratios are used in those instances in which a hospital's
> operating or capital cost-to-charge ratios fall outside
> reasonable parameters. CMS sets forth the reasonable
> parameters and the statewide cost-to-charge ratios in each
> year's annual notice of prospective payment rates published
> in the FEDERAL REGISTER in accordance with
> §412.8(b). (Emphasis added).

(i) (1) For discharges occurring on or after August 8, 2003, CMS may specify an alternative to the ratios otherwise applicable under paragraphs (h) or (i)(2) of this section. A hospital may also request that its fiscal intermediary use a different (higher or lower) cost-to-charge ratio based on substantial evidence presented by the hospital. Such a request must be approved by the CMS Regional Office.

(2) For discharges occurring on or after October 1, 2003, the operating and capital cost-to-charge ratios applied at the time a claim is processed are based on either the most recent settled cost report or the most recent tentative settled cost report, whichever is from the latest cost reporting period.

(3) For discharges occurring on or after August 8, 2003, the fiscal intermediary may use a statewide average cost-to-charge ratio if it is unable to determine an accurate operating or capital cost-to-charge ratio for a hospital in one of the following circumstances:

(i) New hospitals that have not yet submitted their first Medicare cost report. (For this purpose, a new hospital is defined as an entity that has not accepted assignment of an existing hospital's provider agreement in accordance with §489.18 of this chapter.) (Emphasis added).

## STATEMENT OF THE CASE AND PROCEDURAL HISTORY:

Mayo Clinic Hospital (Provider) is an acute care teaching facility located in Phoenix, Arizona. It began operations effective October 28, 1998, and subsequently filed Medicare cost reports for its fiscal years ended December 31, 2000, 2001, and 2002.[1] Blue Cross and Blue Shield of Arizona (Intermediary)[2] reviewed the cost reports but did not issue an NPR for these three fiscal periods until September 2005. Since the Provider did not have "settled" cost reports available until the NPRs were issued, the Intermediary determined the Provider's outlier payments by applying statewide cost-to-charge ratios to the Provider's covered charges. The Intermediary's decision to use the statewide cost-to-charge ratios was based upon its interpretation of 42 C.F.R. §412.84(h) in effect prior to 2003, i.e., the Intermediary concluded that the statewide cost-to-charge ratios were the only alternative to determine outlier payments absent a settled cost report.

---

[1] The Provider also submitted a cost report for its fiscal year ended December 31, 1999, but it is not at issue in these cases.

[2] Noridian Administrative Services subsequently replaced Blue Cross and Blue Shield of Arizona as the Provider's intermediary.

CNs: 06-1300, 06-1301, and 06-1307

The Provider appealed the Intermediary's outlier determinations to the Board pursuant to 42 C.F.R. §§405.1835-405.1841 and met the jurisdictional requirements of those regulations. The amount of Medicare funds in controversy is approximately $6,176,184 ($1,506,850 applicable to fiscal year 2000, $2,743,399 for 2001, and $1,925,935 for 2002).[3]

The Provider was represented by Ronald W. Grousky, Medicare Coordinator, Mayo Clinic. The Intermediary was represented by Bernard M. Talbert, Esquire, Associate Counsel, Blue Cross Blue Shield Association.

PARTIES' CONTENTIONS:

The Provider contends that 42 C.F.R. §412.84(h), in effect prior to 2003, does not specifically address how to handle new hospitals that have filed a cost report but have not yet received settled cost reports. However, contrary to the Intermediary's interpretation, the regulation authorizes the use of statewide cost-to-charge ratios for determining outlier payments only when a provider's cost-to-charge ratios fall outside reasonable parameters. Furthermore, based upon the changes made to 42 C.F.R. §412.84 in 2003, it is clear that longstanding Medicare policy dictates that the Intermediary should have used the cost-to-charge ratios from the Provider's filed (yet unsettled) cost reports.

The Provider refers to 42 C.F.R. §412.84(i)(3) and (i)(3)(i) which states that intermediaries may use a statewide average cost-to-charge ratio if they are unable to determine an accurate operating or capital cost-to-charge ratio because a hospital has "not yet submitted their first Medicare cost report." Language used by CMS in the preamble to the 2003 rule (68 Fed. Reg. 34,494, 34,500 June 9, 2003) supports this position, stating in part:

> . . . hospitals that have not yet filed their first Medicare cost reports . . . would still receive the statewide average cost-to-charge ratios.

In addition, language used by CMS in 1988 illustrates this policy is longstanding. A discussion about PPS (53 Fed. Reg. 38,476, 38,503, Sept. 30, 1988), states in part:

> [f]or hospitals that have not yet filed their first Medicare cost report with their fiscal intermediary or for which the intermediary is unable to compute a reasonable cost-to-charge ratio, we computed statewide average cost-to-charge ratios. . .

The Provider notes that the Intermediary recognized this policy, and on January 23, 2003, prior to the changes made to 42 C.F.R. §412.84, began using cost-to-charge ratios from the Provider's as filed cost reports. Notably, using the "best available data" to establish payments under PPS is consistent with CMS policy.

---

[3] Provider's Revised Final Position Paper at 4.

The Provider also disagrees with the Intermediary's argument that there is no authority to retroactively adjust the subject outlier payments. The Intermediary relies on 42 C.F.R. §412.116(e), which states: "[p]ayments for outlier cases . . . are not made on an interim basis. The outlier payments are made based on submitted bills and represent final payment" and 53 Fed. Reg. 38,476, Sept. 30, 1998 which states: [w]e proposed to continue our policy that outlier payments would be final and not subject to recalculation based on later data that would affect the hospital specific cost-to-charge ratios." The Provider argues that it is not requesting a recalculation based upon later data, but is disputing the propriety of the data used.

The Intermediary relies on the regulation in effect during the subject cost reporting periods that says the cost-to-charge ratio is based on the latest available settled cost report for a hospital. Since there was no settled cost report available during these periods, and since the regulation provides no discussion to default to a filed cost report, the only other option discussed is the use of statewide ratios.[4]

The Intermediary also contends that it had no authority to retroactively adjust outlier payments for the period in question. CMS did not revise its policy at 42 C.F.R. §412.116(e), stated above, until August 8, 2003. (68 Fed. Reg. 34,494, June 9, 2003). The Intermediary points out that CMS previously denied the Provider's request to have their outlier payments retroactively revised based upon the June 9, 2003 final rule.[5]

In addition, the Intermediary rejects the Provider's argument that CMS consistently relies upon the "best data available" to determine program payments under PPS. In the example cited by the Provider, and contrary to the instant case, CMS relied upon the best data available to support a regulatory methodology.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND DISCUSSION:

After consideration of Medicare law and guidelines, parties' contentions, and evidence presented, the Board finds and concludes that the Intermediary incorrectly determined the Provider's outlier payments. The Intermediary made its determinations by applying statewide cost-to-charge ratios to the Provider's covered charges. However, the Provider is entitled to have its outlier payments calculated by having cost-to charge ratios determined from its "as filed" cost reports applied to covered charges.

42 U.S.C. §1395ww(d)(5)(A), the statutory authority for outlier payments under Medicare's inpatient prospective payment system, does not address the circumstances at issue in this case. In pertinent part, the statute provides only that a hospital may receive additional payments where its charges "adjusted to cost" exceed certain dollar values. The statute does not explain how this determination (adjustment to cost) is to be made, however.

---

[4] Transcript (Tr.) at 36. Intermediary Revised Final Position Paper at 3.
[5] Exhibit I-1.

To address this matter the Secretary of DHHS (the Secretary) promulgated 42 C.F.R. §412.84ff.  In part, these rules explain that the ratios of a hospital's costs to its charges are applied to its billed charges to determine outlier status.  However, 42 C.F.R. §412.84(h), which explains how the ratios are determined, also does not address the specific circumstances of this case.  That is, the regulation explains that a provider's ratios are determined annually based upon the provider's latest available "settled" cost report.  If the ratios fall outside reasonable parameters, then statewide cost-to-charge ratios set by CMS are to be used.  However, the regulation does not make the use of statewide ratios a default methodology when a settled cost report is unavailable. With respect to the instant case, the Provider had submitted cost reports to the Intermediary, and although these cost reports had not yet been settled, there is no assertion that data produced from these cost reports produced cost-to-charge ratios outside reasonable parameters.

Since both the statute and regulations are silent regarding the data to be used to determine outlier payments when a hospital has filed cost reports with its intermediary that have not yet been settled, the Board looks to the intent of the statute and enabling regulation and secondary authorities.  From these sources it is clear that the proper identification of outlier cases and the accuracy of outlier payments are the fundamental objectives of the program.  In the preamble to the final rule published on September 30, 1988, <u>Changes to the Inpatient Hospital Prospective Payment System and Fiscal Year 1989 Rates</u> (53 FR 38476, 38503), HCFA states:

> 3. Hospital Specific Cost-to-Charge Ratios
> [w]e proposed to use hospital-specific cost-to-charge ratios to adjust charges for the purpose of computing cost outlier payments.  The use of hospital-specific cost-to-charge ratios should greatly enhance the accuracy with which outlier cases are identified and outlier payments are computed, since there is wide variation among hospitals in these cost-to-charge ratios.  The increased emphasis on cost in computing outlier payments heightens the need to use reasonably reliable factors to estimate costs from charges.  Therefore, we believe the use of hospital-specific cost-to charge ratios is essential to ensure that outlier payments are made for cases that have extraordinarily high costs, and not merely high charges.
>
> * * * * *
>
> [F]or hospitals that have not yet filed their first Medicare cost report with their fiscal intermediary <u>or for which the intermediary is unable to compute a reasonable cost-to-charge ratio, we computed statewide average cost to charge ratios.</u> . . . (Emphasis added).

This language indicates that the Secretary contemplated a scenario in which cost-to-charge data are available although not "settled" by an intermediary. The common theme is that until a hospital files a cost report there is really no data with which to make a reasonable estimation of the cost-to-charge ratios, so statewide average data are used. However, it is implicit in that language that if a cost report is filed, though not yet settled, data of the character the Secretary has found reliable is available from which computation of "reasonable" cost-to-charge ratios can be computed. Moreover, use of the averages conflicts with the principle discussed in the preamble in that it places reliance on averages that the Secretary discarded as being less accurate than hospital specific data. These interpretive statements, coupled with silence in the regulation itself as to the application in the circumstances here, compel rejection of the Intermediary's position that, absent a settled cost report the regulation requires it to "default" to using a statewide average.

Finally, the Board finds that a recalculation of the Provider's outlier payments is not a retroactive adjustment that would be prohibited by 42 C.F.R. §412.116(e). The regulation contemplates an adjustment(s) based upon "later data," or data that was not available at the time the payments were made. With respect to the instant case, the required recalculation is based upon data contemporaneous to the subject cost reporting periods. At the time the Intermediary made its tentative settlement, the cost-to-charge ratios used to calculate the outlier payments should have been updated to the best data available. The data from the as-submitted cost reports comports far more effectively with the intent of the pertinent statute and regulations to properly identify and pay outlier cases, as well as the underlying intent of the program to properly pay providers for services rendered to Medicare beneficiaries.

DECISION AND ORDER:

The Intermediary did not use the proper cost-to-charge ratios to calculate the Provider's outlier payments. The Intermediary is to base the Provider's outlier payments on data found in the Provider's tentatively settled cost reports.

Board Members Participating:

Suzanne Cochran, Esquire
Yvette C. Hayes
Michael D. Richards, C.P.A.
Keith E. Braganza, C.P.A. (inactive)

FOR THE BOARD:

Suzanne Cochran, Esquire
Chairperson

DATE:   DEC 2 2 2008

<u>Enclosure</u>

## <u>Final Decision Review and Appeal Information</u>

The Provider Reimbursement Review Board's (Board) decision becomes final 60 days after the date of receipt by the provider unless within that time the Administrator of HCFA notifies the parties of an action taken under the provisions of 42 C.F.R. § 405.1875.  If such action is taken, then the Administrator's decision becomes final 60 days after receipt thereof by the provider.

Providers are permitted to initiate two actions within specified time limits.  First, the provider (and/or the intermediary) may request the Administrator to review a Board decision within 15 days of its receipt.  (See § 405.1875(b)).  Secondly, Section 1878(f) of the Social Security Act ("Act"), 42 U.S.C. § 1395oo(f), permits a provider to obtain judicial review of a final decision of either the Board or the Administrator by filing a civil action within 60 days of the date on which the provider receives such decision.  (See also 42 C.F.R. § 405.1877).  For your convenience, a copy of each of the above-referenced authorities is enclosed.

Enclosures

**§ 405.1875 Administrator's review.**

(a) *General rule.* (1) Except for a Board determination under § 405.1842 that it lacks the authority to decide an issue, the Administrator, at his or her discretion, may review any final decision of the Board, including a decision under § 405.1873 about the Board's jurisdiction to grant a hearing. The Administrator may exercise this discretion on his or her own motion, in response to a request from a party to a Board hearing or in response to a request from HCFA.

(2) The Office of the Attorney Advisory will examine the Board's decisions, the requests made by a party or HCFA and any submission made in accordance with the provisions of this section in order to assist the Administrator in deciding whether to exercise this review authority.

(b) *Request for review.* A party or HCFA requesting the Administrator to review a Board decision must file a written request with the Administrator within 15 days of the receipt of the Board decision.

(c) *Criteria for deciding whether to review.* In deciding whether to review a Board decision, either on his or her own motion or in response to a request from a party to the hearing or HCFA, the Administrator will normally consider whether it appears that:

(1) The Board made an erroneous interpretation of law, regulation or HCFA Ruling;

(2) The Board's decision is not supported by substantial evidence; or

(3) The case presents a significant policy issue having a basis in law and regulations, and review is likely to lead to the issuance of a HCFA Ruling or other directive needed to clarify a statutory or regulatory provision;

(4) The Board has incorrectly assumed or denied jurisdiction or extended its authority to a degree not provided for by statute, regulation or HCFA Ruling; and

(5) The decision of the Board requires clarification, amplification, or an alternative legal basis for the decision.

(d) *Decision to review.* (1) Whether or not a party or HCFA has requested review, the Administrator will promptly notify the parties and HCFA whether he or she has decided to review a decision of the Board and, if so, will indicate the particular issues he or she will consider.

(2) The Administrator may decline to review a case or any issue in a case even if a party has filed a written request for review under paragraph (b) of this section.

(e) *Written submissions.* (1) Within 15 days of receipt of a notice that the Administrator has decided to review a Board decision, a party or HCFA may submit to the Administrator, in writing:

(i) Proposed findings and conclusions;

(ii) Supporting views or exceptions to the Board decision;

(iii) Supporting reasons for the exceptions and proposed findings; and

(iv) A rebuttal of the other party's request for review or other submissions already filed with the Administrator.

(2) These submissions shall be limited to issues the Administrator has decided to review and confined to the record of the Board hearing.

(3) A party or HCFA, within 15 days of receipt of a notice that the Administrator has decided to review a decision, may also request that the decision be remanded and state reasons for doing so. Reasons for a request to remand may include new, substantial evidence concerning—

(i) Issues presented to the Board; and

(ii) New issues that have arisen since the case was presented to the Board.

(4) A copy of any written submission made under this paragraph shall be sent simultaneously to each other party to the Board hearing and to HCFA, if HCFA has previously—

(i) Requested that the Administrator review a Board decision or filed a written submission in response to a party's request for review.

(ii) Responded to a party's request for review; or

(iii) Submitted material after the Administrator has announced that he or she will review a Board decision.

(f) *Ex parte communications prohibited.* All communications from any of the parties or HCFA about a Board decision being reviewed by the Administrator must be in writing and must contain a certification that copies have been served on the parties and HCFA, as appropriate. The Administrator will not consider any communication that does not meet these requirements or is not submitted within the required time limits.

(g) *Administrator's decision.* (1) If the Administrator has notified the parties and HCFA that he or she has decided to review a Board decision, the Administrator will affirm, reverse, modify or remand the case.

(2) The Administrator will make this decision within 60 days after the provider received notification of the Board decision and will promptly mail a copy of the decision to each party and to HCFA.

(3) Any decision other than to remand will be confined to—

(i) The record of the Board, as forwarded by the Board;

(ii) Any materials submitted under paragraphs (b) or (e) of this section; and

(iii) Generally known facts that are not subject to reasonable dispute.

(4) The Administrator may rely on prior decisions of the Board, the Administrator and the courts, and other applicable law, whether or not cited by the parties and HCFA.

(h) *Remand.* (1) A remand to the Board by the Administrator vacates the Board's decision.

(2) The Administrator may direct the Board to take further action with respect to the development of additional facts or new issues, or to consider the applicability of laws or regulations other than those considered by the Board. The following are not acceptable bases for remand—

(i) Presentation of evidence existing at the time of the Board hearing that was known or reasonably could have been known;

(ii) Introduction of a favorable court case that was either not available in print at the time of the Board hearing or was decided after the Board hearing;

(iii) Change of a party's representation before the Board;

(iv) Presentation of an alternative legal basis concerning an issue in dispute; or

(v) Attempted retraction of a waiver of a right made before or at the Board hearing.

(3) After remand, the Board will take the action requested in the remand action and issue a new decision.

(4) The new decision will be final unless the Administrator reverses, affirms, modifies, or again remands the decision in accordance with the provisions of the section.

[48 FR 45773, Oct. 7, 1983]

# THE SOCIAL SECURITY ACT AS AMENDED - TITLE XVIII

## Section 1878(f)(1) Judicial Review

(f)(1) A decision of the Board shall be final unless the Secretary, on his own motion, and within 60 days after the provider of services is notified of the Board's decision, reverses, affirms, or modifies the Board's decision. Providers shall have the right to obtain judicial review of any final decision of the Board, or of any reversal, affirmance, or modification by the Secretary, by a civil action commenced within 60 days of the date on which notice of any final decision by the Board or of any reversal, affirmance, or modification by the Secretary is received. Providers shall also have the right to obtain judicial review of any action of the fiscal intermediary which involves a question of law or regulations relevant to the matters in controversy whenever the Board determines (on its own motion or at the request of a provider of services as described in the following sentence) that it is without authority to decide the question, by a civil action commenced within sixty days of the date on which notification of such determination is received. If a provider of services may obtain a hearing under subsection (a) and has filed a request for such a hearing, such provider may file a request for a determination by the Board of its authority to decide the question of law or regulations relevant to the matters in controversy (accompanied by such documents and materials as the Board shall require for purposes of rendering such determination). The Board shall render such determination in writing within thirty days after the Board receives the request and such accompanying documents and materials, and the determination shall be considered a final decision and not subject to review by the Secretary. If the Board fails to render such determination within such period, the provider may bring a civil action (within sixty days of the end of such period) with respect to the matter in controversy contained in such request for a hearing. Such action shall be brought in the district court of the United States for the judicial district in which the provider is located (or, in an action brought jointly by several providers, the judicial district in which the greatest number of such providers are located) or in the District Court for the District of Columbia and shall be tried pursuant to the applicable provisions under chapter 7 of title 5, United States Code, notwithstanding any other provisions in section 205. Any appeal to the Board or action for judicial review by providers which are under common ownership or control or which have obtained a hearing under subsection (b) must be brought by such providers as a group with respect to any matter involving an issue common to such providers.

§405.1877  Judicial review.

(a) *General rule.* Section 1878(f) of the Act permits a provider to obtain judicial review of a final decision of the Board, or of a reversal, affirmation, or modification by the Administrator of a Board decision, by filing a civil action pursuant to the Federal Rules of Civil Procedure within 60 days of the date on which the provider received notice of—

(1) A final decision by the Board; or

(2) Any reversal, affirmance, or modification by the Administrator.

The Board's decision is not final if the Administrator reverses, affirms or modifies the decision within 60 days of the date on which the provider received notice of the decision.

(b) *Administrator declines to review a Board decision.* If the Administrator declines to review a Board decision, the provider must file its appeal within 60 days of receipt of the decision of the Board.

(c) *Administrator does not act after reviewing a Board decision.* If the Administrator notifies the parties that he or she has decided to review a Board decision and then does not make a decision within the 60 days allotted for his or her review, this subsequent inaction constitutes an affirmance allowing a provider an additional 60 days in which to file for judicial review, beginning with the date the Administrator's time expires for taking action under §405.1875(g)(2).

(d) *Matters not subject to judicial review.* Certain matters affecting payments to hospital under the prospective payment system are not subject to judicial review, as provided in section 1886(d)(7) of the Act and §405.1804.

(e) *Group appeals.* Any action under this section by providers that are under common ownership or control (see §413.17 of this chapter) must be brought by the providers as a group with respect to any matter involving an issue common to the providers.

(f) *Venue for appeals.* An action for judicial review must be brought in the District Court of the United States for the judicial district in which the provider is located (or, effective April 20, 1983, in an action brought jointly by several providers, the judicial district in which the greatest number of such providers are located) or in the District Court for the District of Columbia. Effective April 20, 1983, any action for judicial review by providers under common ownership or control (§413.17 of this chapter), must be brought by such providers as a group with respect to any matter involving an issue common to the providers.

(g) *Service of process.* Process must be served as described under 45 CFR part 4.

[48 FR 39836, Sept. 1, 1983, as amended at 48 FR 45774, Oct. 7, 1983; 51 FR 34793, Sept. 30, 1986]

(a)     General rule
Section 1878(f) of the Act permits a provider to obtain judicial review of a final decision of the Board, or of a reversal, affirmation, or modification by the Administrator of a Board decision, by filing a civil action pursuant to the Federal Rules of Civil Procedure within 60 days of the date on which the provider received notice of--
(1)     A final decision by the Board; or
(2)     Any reversal, affirmation, or modification by the Administrator.
The Board's decision is not final if the Administrator reverses, affirms or modifies the decision within 60 days of the date on which the provider received notice of the decision.

(b)     Administrator declines to review a Board decision
If the Administrator declines to review a Board decision, the provider must file its appeal within 60 days of receipt of the decision of the Board.

(c)     Administrator does not act after reviewing a Board decision
If the Administrator notifies the parties that he or she has decided to review a Board decision and then does not make a decision within the 60 days allotted for his or her review, this subsequent inaction constitutes an affirmance allowing a provider an additional 60 days in which to file for judicial review, beginning with the date the Administrator's time expires for taking action under Section 405.1875(g)(2).

(d)     Matters not subject to judicial review
Certain matters affecting payments to hospital under the prospective payment system are not subject to judicial review, as provided in Section 1886(d)(7) of the Act and Section 405.1804.

(e)     Group appeals
Any action under this section by providers that are under common ownership or control (see Section 405.427) must be brought by the providers as a group with respect to any matter involving an issue common to the providers.

(f)     Venue for appeals
An action for judicial review must be brought in the District Court of the United States for the judicial district in which the provider is located (or, effective April 20, 1983, in an action brought jointly by several providers, the judicial district in which the greatest number of such providers are located) or in the District Court for the District of Columbia.  Effective April 20, 1983, any action for judicial review by providers under common ownership or control (Section 405.427), must be brought by such providers as a group with respect to any matter involving an issue common to the providers.

(g)     Service of process
Process must be served as described under 45 CFR Part 4.

(41 FR 52051, Nov. 26, 1976.  Redesignated at 42 FR 52826, Sept. 30, 1977 amended at 48 FR 39836, Sept. 1, 1983; 48 FR 45774, Oct. 7, 1983)

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Telephone 410-786-3176 Facsimile 410-786-0043



## Office of the Attorney Advisor

FEB 2 5 2009

**VIA CERTIFIED MAIL**

Mr. Ronald W. Grousky
Mayo Foundation
Ozmun West 3
200 First Street, SW
Rochester, MN 55905

Re: <u>Mayo Clinic Hospital</u>, PRRB Decision No. 2009-D5

Dear Mr. Grousky:

Enclosed is a copy of the Administrator's decision in the above case reversing the decision of the

Provider Reimbursement Review Board.  This constitutes the final administrative decision of the

Secretary of the Health and Human Services.  Pursuant to Section 1878(f) of the Social Security

Act and 42 CFR 405.1877, the Provider may obtain judicial review by filing a civil action within

60 days of receipt of this decision.

                    Sincerely yours,

                    Jacqueline R. Vaughn
                    Attorney Advisor

Enclosure

cc:  Bernard M. Talbert, Esquire, Intermediary's Representative

**EXHIBIT B**

# CENTERS FOR MEDICARE AND MEDICAID SERVICES

## *Decision of the Administrator*

| In the case of: | | Claim for: |
|---|---|---|
| **Mayo Clinic Hospital** | | **Provider Cost Reimbursement Determination for Cost Reporting Periods Ending: 12/31/2000; 12/31/2001 and 12/31/2002** |
| **Provider** | | |
| **vs.** | | |
| **Blue Cross /Blue Shield Association Noridian Administrative Services** | | **Review of: PRRB Dec. No. 2009-D5 Dated: December 22, 2008** |
| **Intermediary** | | |

This case is before the Administrator, Centers for Medicare & Medicaid Services (CMS), for review of the decision of the Provider Reimbursement Review Board (Board). The review is during the 60-day period in § 1878(f)(1) of the Social Security Act (Act), as amended (42 USC 1395oo(f)). The parties were notified of the Administrator's intention to review the Board's decision. No comments were received. Accordingly, this case is now before the Administrator for final agency review.

## **BACKGROUND**

The Provider is a general acute care teaching hospital located in Phoenix, Arizona. The Provider entered the Medicare program on November 18, 1998.[1] The Provider's first cost report was for FYE December 31, 1999 and was filed on May 31, 2000.[2] The Notice of Program Reimbursement (NPR) for the FYE December 31, 1999 cost report was issued on September 26, 2005.[3]

---

[1] Provider's Revised Final Position Paper at 5.
[2] Id.
[3] The Administrator notes that FYE December 31, 1999, is not at issue in this case.

For the three fiscal periods in dispute, the Provider petitioned the Intermediary to authorize additional outlier payments. The Provider did not yet have a "settled" cost report since entering the Medicare program. The Intermediary applied the statewide cost-to-charge ratios to determine the Provider's outlier payments. The NPRs for the FYEs December 31, 2000 and 2001 were issued on September 29, 2005.[4] The NPR for FYE December 31, 2002 was issued on September 30, 2005.[5] Thus, the cost reports for the Provider's first four years under Medicare (three of which are at issue in this case) were all settled in September 2005.

## ISSUE AND BOARD'S DECISION

The issue is whether the Intermediary used the proper cost-to-charge ratios in calculating the Provider's outlier payments.

The Board held that the Intermediary did not use the proper cost-to-charge ratios to calculate the Provider's outlier payments. The Board held that the Intermediary should have used the cost-to-charge ratios determined from the Provider's "as filed" cost reports, instead of using the statewide cost-to-charge ratios. The Board concluded that the statute and enabling regulation did not permit the use of the statewide cost-to-charge ratios as a default methodology, when a settled cost report was not available. The Board found that the use of the statewide cost-to-charge ratios conflicted with the principles discussed in the preamble in that it placed reliance on averages that the Secretary discarded as being less accurate than the hospital's specific data.

Finally, the Board concluded that a recalculation of the Provider's outlier payments was not a retroactive adjustment and would not violate 42 C.F.R. § 412.116(e) because the required recalculations are based upon data contemporaneous to the subject cost reporting periods. At the time the Intermediary made its tentative settlement, the cost-to-charge ratios used to calculate the outlier payments should have been updated to the best data available, which the Board determined was the data from the Provider's "as submitted" cost reports. The Board ordered that the Intermediary was to base the Provider's outlier payments on data found in the Provider's tentatively settled cost reports.

---

[4] Intermediary's Final Position Paper Exhibit I-2.
[5] Intermediary's Final Position Paper Exhibit I-1.

## DISCUSSION

The entire record, which was furnished by the Board, has been examined, including all correspondence, position papers, and exhibits. The Administrator has reviewed the Board's decision.

Title VI of the Social Security Amendments of 1983,[6] adding § 1886(d) to the Act, established the inpatient prospective payment system (IPPS) for reimbursement of inpatient hospital operating costs for all items and services provided to Medicare beneficiaries other than physician's services associated with each discharge. These amendments changed the method of payment for inpatient hospital services for most hospitals under Medicare. Under IPPS, hospitals and other health care providers are reimbursed their inpatient operating costs on the basis of prospectively determined national and regional rates for each discharge rather than reasonable operating costs. The purpose of IPPS was to reform the financial incentives hospitals face, promoting efficiency by rewarding costs effective hospital practices.[7]

Pursuant to § 1886(d)(5)(A) of the Act, Congress authorized the Secretary to make additional payments under IPPS for patient discharges that qualify as "outlier" cases, which involve unusually costly or lengthy patient treatments. To implement this additional payment provision, the Secretary promulgated regulations at 42 C.F.R § 412.80, et seq. (2000). The regulation at 42 C.F.R § 412.84(h) states, with respect to cost outliers, that:

> The operating cost-to-charge ratio and, effective with cost reporting periods beginning on or after October 1, 1991, the capital cost-to-charge ratio used to adjust covered charges are computed annually by the intermediary for each hospital based on the latest available settled cost report for that hospital and charge data for that same time period as that covered by the cost report. Statewide cost-to-charge ratios are used in those instances in which a hospital's operating or capital cost-to-charge ratios fall outside reasonable parameters. CMS sets forth these parameters and the statewide cost-to-charge ratios in each year's annual notice of prospective payment rates published under §412.8(b). (Emphasis added.)

Thus, under the existing regulation for the fiscal periods in dispute, operating and capital cost-to-charge ratios are computed annually by the intermediary for each hospital based

---

[6] Pub. L. No. 98-21.
[7] H.R. Rep. No. 25, 98th Cong., 1st Sess. 132 (1983).

on the latest available settled cost report for that hospital.[8]  Finally, if the intermediary is unable to compute a reasonable cost-to-charge ratio, CMS computes a statewide average cost-to-charge ratio to use in the cost outlier calculation.[9]

In the September 30, 1988 final rule with comments, the Secretary noted that outlier payments would be final and not subject to recalculation based on later data.  The Secretary explained that:

> This policy was first set forth in the September 1, 1983 final rule (48 FR 39779) and at that time codified at § 405.454(m)(5).  This section was subsequently redesignated as § 413.64(k)(1)(ii) in a final rule with comment period published on September 30, 1986 (51 FR 34790).  However, in a final rule with comment period published on January 21, 1988 (53 FR 1621), when this section was further redesignated as § 412.116(e), we inadvertently deleted from that section the sentence that specified that outlier payments are based on submitted bills and represent final payment.  As a part of this proposed rule, we corrected that paragraph to include the deleted sentence.[10]

Furthermore, the Secretary explained, in response to comments requesting  that the latest filed cost report be used to compute the hospital-specific cost-to-charge ratios, as opposed to the latest settled cost report, that:

> *Comment*:    A number of commenters expressed concern about the timeliness of the data we are using to compute the hospital-specific cost-to-charge ratios. Because the latest settled cost reports may be as much as three years old, commenters were concerned that there could be significant fluctuations in the ratios and that the data would not reflect current cost-to-charge ratios.  Some commenters suggested that we use the latest filed cost report and others stated that we should update the ratios more than once a year.
>
> *Response*: We believe that the hospital-specific cost-to-charge ratios should be developed using the most current and accurate data available.

---

[8] 53 Fed. Reg. at 38503 (Sept. 30, 1988).  Correspondingly, the regulation at 42 C.F.R. § 412.525(2002) states that, "[n]o retroactive adjustments will be made to the outlier payments upon cost report settlement to account for differences between the estimated cost-to-charge-ratios and the actual cost-to-charge ratio of the case."  The regulation at 42 C.F.R. § 412.116(e) also states that "[p]ayments for outlier cases … are not made on an interim basis…."

[9]  53 Fed. Reg. at 38503 (Sept. 30, 1988).

[10] 53 Fed. Reg. 38503. (Sept. 30, 1988).

> While the latest filed cost report represents the most current data, we have
> found that Medicare costs are generally overstated on the filed cost report
> and are subsequently reduced as a result of audit. <u>Therefore, we believe
> the latest settled cost report represents the most accurate available data for
> computing the hospital-specific cost-to-charge ratios.</u>[11] (Emphasis added.)

This particular case centers on whether the Intermediary properly calculated the Provider's outlier payments using the statewide cost-to-charge ratios to the Provider's covered charges, or as the Provider proposes, the Intermediary was required to use the Provider's cost-to-charge ratios determined from the "as filed" cost reports applied to covered charges.   The Board held that the Intermediary incorrectly determined the Provider's outlier payments. The Board held that the Provider's outlier payments should be based on data found in the Provider's as submitted or as filed cost reports and, therefore, should be recalculated.[12]

The Administrator finds that the Intermediary properly used the statewide cost-to-charge ratios to determine the Provider's outlier payments in the absent of settled cost reports.   While the latest filed cost report represents the most current data, the Administrator finds that the latest settled cost report, or when that is not available, the statewide average, generally represents more accurate data for computing the hospital-specific cost-to-charge ratios. Thus, it is reasonable that, as a matter of policy, CMS prohibits the use of "as filed" cost reports to compute the ratio.[13] Consequently the Administrator finds that a statewide average cost-to-charge ratio is appropriate to be used

---

[11] Id. at 38507.  See also 68 Fed. Reg. 34494 (June 9, 2003) (Summary: "Under the existing outlier methodology, the cost-to-charge ratios from hospitals' latest settled cost reports are used in determining a fixed-loss amount cost outlier threshold."); Id. at 34494 ("Under our existing regulation at § 412.84(h), the operating cost-to-charge ration and, ... the capital cost-to-charge ratio used to adjust covered charges are computed annually by the intermediary for each hospital based on the latest available settled cost report for that hospital..."); Id. at 34495 ("Currently, we use the most recent settled cost report when determining cost-to-charge ratios for IPPS hospitals."); Id. at 34497.

[12] While the Board discussion refers to "as submitted" cost reports, the Board's order requires the use of the tentatively settled cost reports. The Provider never requested use of such cost reports, nor does the record contain evidence of such cost reports, so it would appear that the reference to "tentatively" settled is an inadvertent error.

[13] CMS' policy is further supported as a prophylactic rule to prevent the manipulation of costs through the use of unaudited costs/cost reports, in light of the documented manipulation generally observed by CMS in the outlier payment arena.

when an intermediary is unable to compute a reasonable cost-to-charge ratio because there is no settled cost report.[14]

Further, while the Secretary made changes to allow for the use of settled or tentatively settled cost reports, effective after the periods involved in this case, the Secretary continued to have concerns about the accuracy of the latter data. Notably, the Secretary never proposed to use data from as-submitted cost reports. Accordingly, in allowing the use of tentatively settled cost reports, the Secretary made corresponding changes to require the reconciliation of outlier payments to account for differences between the cost-to-charge ratio (CCR) used to pay the claim at its original submission and the CCR determined at final settlement of the cost reporting period during which the discharge occurred. Consequently, the Administrator determines that, for the periods at issue in this case, neither "as-submitted" cost reports, nor tentatively settled cost reports, maybe used to calculate the cost to charge ratios.

Thus, applying the relevant law and program policy to the foregoing facts, the Administrator finds that the Intermediary properly applied the regulations at 42 C.F.R. § 412.84(h) by calculating the Provider's cost-to-charge ratios using the statewide average.

---

[14] With respect to the Board's determination that a recalculation of the Provider's outlier payments are not a retroactive adjustments, the CMS longstanding policy for the cost years in this case is that outlier payments are final and not subject to recalculation based on later data to account for differences between estimated cost-to-charge-ratios and the actual cost-to-charge-ratios of the case.

## DECISION

The decision of the Board is reversed in accordance with the foregoing opinion.

## THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF THE SECRETARY OF HEALTH AND HUMAN SERVICES.

Date: 2|24|09

Tim Hill
Acting Deputy Administrator
Centers for Medicare & Medicaid Services